**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-319 (CRC) |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 1

ARGUMENT ............................................................................................................... 10

    I.       Legal Standards ............................................................................... 11

    II.     The Department Did Not Adequately Describe or Support Its Search ............ 12

    III.    The Department Failed to Conduct an Adequate Search for Records ............. 14

          A.     It Is Not Credible that U.S. Attorney Huber Would Be Directed
                to Undertake a Complex Investigation of the High-Profile and
                Sensitive Matters Raised in the July and September Letters Without
                Any Written Guidance Regarding the Scope of His Review ............... 14

          B.     The Department's Claimed Lack of Records Is Not Credible
                in Light of Its Documented Prior Practice in Appointing a
                Special Prosecutor ............................................................... 19

          C.     The Department Is Construing the Request Too Narrowly ................ 21

          D.     The Additional Search Sought by Plaintiff Would
                Not Be Burdensome ............................................................. 23

CONCLUSION ............................................................................................................. 24

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Ctr. for Biological Diversity Inc. v. U.S. Envtl. Prot. Agency,*
    610 F.2d 824 (D.C. Cir. 1979) ............................................................................. 12

*Founding Church of Scientology v. Nat'l Sec. Agency,*
    610 F.2d 824 (D.C. Cir. 1979) ....................................................................... 11, 20

*Krikorian v. U.S. Dep't of State,*
    984 F.2d 461 (D.C. Cir. 1993) ............................................................................. 12

*Morley v. Cent. Intelligence Agency,*
    508 F.3d 1108 (D.C. Cir. 2007) ........................................................................... 14

*Oglesby v. U.S. Dep't of the Army,*
    79 F.3d 1172 (D.C. Cir. 1996) ....................................................................... 11, 12

*Oglesby v. U.S. Dep't of the Army,*
    920 F.2d 57 (D.C. Cir. 1990) ............................................................................... 11

*United States v. Chem. Found. Inc.,*
    272 U.S. 1 (1926) ............................................................................................... 20

*Valencia-Lucena v. U.S. Coast Guard,*
    180 F.3d 321 (D.C. Cir. 1999) ....................................................................... 11, 22

*Weisberg v. U.S. Dep't of Justice,*
    627 F.2d 365 (D.C. Cir. 1980) ............................................................................. 12

## STATUTES AND REGULATIONS

28 U.S.C § 510 ................................................................................................. 7, 15

28 U.S.C. § 515 ........................................................................................... 7, 15, 20

28 U.S.C § 547 ..................................................................................................... 15

A.G. Order No. 2232-99, 64 Fed. Reg. 37,038-44 (July 9, 1999) ........................... 7

## FEDERAL RULES

Fed. R. Civ. P. 56(a) ............................................................................................ 11

## INTRODUCTION

In November 2017, Defendant U.S. Department of Justice represented to the U.S. House of Representatives Committee on the Judiciary that, in lieu of appointing a second special counsel as requested by the Committee, the Department had "directed senior federal prosecutors to evaluate certain issues" raised in letters from the Committee relating to presidential candidate Hillary Clinton, the Clinton Foundation, and the conduct of the Federal Bureau of Investigation during the 2016 presidential campaign. Plaintiff American Oversight promptly filed requests under the Freedom of Information Act seeking records that would identify those "senior federal prosecutors" and the mandate they were given. In response, the Department identified one prosecutor directed to evaluate these matters—the U.S. Attorney for the District of Utah. But notwithstanding the irregularity of lodging such matters with the U.S. Attorney for the District of Utah given its limited geographic remit, the Department claims that it found no records providing written directives or guidance, formal or informal, to him regarding the scope of the review he has been directed to undertake. The Department further claimed that this was so despite the fact that the absence of written directives or guidance in these circumstances would be contrary to the Department's past practice. The purported absence of records where one would ordinarily expect to find them indicates either the Department's search was inadequate or we—Plaintiff, Congress, and the American public—are to trust that an irregular and politically charged assignment occurred one-on-one, orally, with no contemporaneous record.

## BACKGROUND

*Chairman Goodlatte's 2017 Call for an Investigation of Hillary Clinton*

On July 27, 2017, Bob Goodlatte, Chairman of the House of Representatives Committee on the Judiciary ("the Committee"), and nineteen other members of the Committee signed a

letter to then-Attorney General Jeff Sessions and Deputy Attorney General Rod Rosenstein requesting the appointment of a second special counsel to investigate numerous actions taken by persons who served in the executive branch during the Obama administration, including former Secretary of State Hillary Clinton. *See* Letter from Bob Goodlatte, Chairman, U.S. House of Representatives, Comm. on the Judiciary, et al., to Jeff Sessions, Attorney General, U.S. Dep't of Justice & Rod Rosenstein, Deputy Attorney General, U.S. Dep't of Justice (July 27, 2017) (found in Exhibit A to the Declaration of Vanessa Brinkmann, ECF No. 16-3, at 12–18) ("July Letter"). Specifically, the July Letter enumerated fourteen "questions" that the Committee believed a new special counsel should be appointed to investigate:

1) Then-Attorney General Loretta Lynch directing [then-FBI Director James] Comey to mislead the American people on the nature of the Clinton investigation;
2) The shadow cast over our system of justice concerning Secretary Clinton and her involvement in mishandling classified information;
3) FBI and DOJ's investigative decisions related to former Secretary Clinton's email investigation, including the propriety and consequence of immunity deals given to potential Clinton co-conspirators Cheryl Mills, Heather Samuelson, John Bentel and possibly others;
4) The apparent failure of DOJ to empanel a grand jury to investigate allegations of mishandling of classified information by Hillary Clinton and her associates;
5) The Department of State and its employees' involvement in determining which communications of Secretary Clinton's and her associates to turn over for public scrutiny;
6) WikiLeaks disclosures concerning the Clinton Foundation and its potentially unlawful international dealings;
7) Connections between the Clinton campaign, or the Clinton Foundation, and foreign entities, including those from Russia and Ukraine;
8) Mr. Comey's knowledge of the purchase of Uranium One by the company Rosatom, whether the approval of the sale was connected to any donations made to the Clinton Foundation, and what role Secretary Clinton played in the approval of that sale that had national security ramifications;
9) Disclosures arising from unlawful access to the Democratic National Committee's (DNC) computer systems, including

inappropriate collusion between the DNC and the Clinton campaign to undermine Senator Bernie Sanders' presidential campaign;

10) Post-election accusations by the President that he was wiretapped by the previous Administration, and whether Mr. Comey and Ms. Lynch had any knowledge of efforts made by any federal agency to unlawfully monitor communications of then-candidate Trump or his associates;

11) Selected leaks of classified information related to the unmasking of U.S. person identities incidentally collected upon by the intelligence community, including an assessment of whether anyone in the Obama Administration, including Mr. Comey, Ms. Lynch, Ms. Susan Rice, Ms. Samantha Power, or others, had any knowledge about the "unmasking" of individuals on then candidate-Trump's campaign team, transition team, or both;

12) Admitted leaks by Mr. Comey to Columbia University law professor, Daniel Richman, regarding conversations between Mr. Comey and President Trump, how the leaked information was purposefully released to lead to the appointment of a special counsel, and whether any classified information was included in the now infamous "Comey memos";

13) Mr. Comey's and the FBI's apparent reliance on "Fusion GPS" in its investigation of the Trump campaign, including the company's creation of a "dossier" of information about Mr. Trump, that dossier's commission and dissemination in the months before and after the 2016 election, whether the FBI paid anyone connected to the dossier, and the intelligence sources of Fusion GPS or any person or company working for Fusion GPS and its affiliates; and

14) Any and all potential leaks originated by Mr. Comey and provide[d] to author Michael Schmidt dating back to 1993.

*Id.* at 15–16.

On September 26, 2017, Chairman Goodlatte and thirteen of the other signatories from the July Letter renewed their call for a second special counsel. *See* Letter from Bob Goodlatte, Chairman, U.S. House of Representatives, Comm. on the Judiciary, *et al.*, to Jeff Sessions, Attorney General, U.S. Dep't of Justice & Rod Rosenstein, Deputy Attorney General, U.S. Dep't of Justice (Sept. 26, 2017) (found in Brinkmann Decl. Ex. A at 19–22) ("September Letter"). The September Letter focused primarily on certain actions taken by the FBI toward the end of the investigation led by then-FBI Director James Comey—with the impetus for the letter stemming

from the revelation that Director Comey had drafted a statement regarding the termination of the investigation of Secretary Clinton before several witnesses had been interviewed, including Secretary Clinton herself. *Id.* at 19. Believing that certain senior government officials "pre-judged" the investigation, the Committee again "implore[d]" Attorney General Sessions and Deputy Attorney General Rosenstein "to name a second special counsel, to investigate this and other matters related to the 2016 election, including the conduct of the Justice Department regarding the investigation into Secretary Clinton's private email server." *Id.* at 21. At no point does the September Letter reference either the sale of Uranium One or the Clinton Foundation— both of which had been listed previously in the July letter. *See id.* at 19-22; July Letter at 16.

*The Department's Responses to Chairman Goodlatte and the Subsequent Investigation*

With Attorney General Sessions slated to testify before the Committee the next day, *see* Cafasso Decl. Exs. 1 & 2, on November 13, 2017, the Assistant Attorney General for Legislative Affairs, Stephen E. Boyd, responded to the Committee's July and September Letters. *See* Letter from Stephen E. Boyd, Assistant Attorney General, Office of Legislative Affairs, U.S. Dep't of Justice, to Bob Goodlatte, Chairman, U.S. House of Representatives, Comm. on the Judiciary (Nov. 13, 2017) (found in Brinkmann Decl. Ex. A at 23–24) ("Boyd Response"). Assistant Attorney General Boyd opened the letter by summarizing the Chairman's letters as "request[ing] the appointment of a Special Counsel to investigate various matters, including the sale of Uranium One, alleged unlawful dealings related to the Clinton Foundation and other matters." *Id.* at 23. The letter goes on to state that "the Attorney General has directed senior federal prosecutors to evaluate certain issues raised in your letters." *Id.* at 23.[1]

---

[1] Despite the use of a past tense ("has directed") and the plural ("senior federal prosecutor*s*") in this representation to Congress, the Department's response to American Oversight's FOIA request identified only one such prosecutor—U.S. Attorney John Huber—who had been directed

On March 6, 2018, Chairman Goodlatte again called on Attorney General Sessions and Deputy Attorney General Rosenstein to appoint a special counsel, this time joined only by Trey Gowdy in his role as Chairman of the House Oversight and Government Reform Committee. *See* Decl. of Cerissa Cafasso in Supp. of Pl.'s Cross-Mot. for Summ. J. & in Opp. to Def.'s Mot. for Summ. J. ("Cafasso Decl.") Ex. 3 ("March Letter"). A special counsel is necessary, the chairmen said, to investigate "certain decisions made and not made by the Department of Justice and FBI in 2016 and 2017"—with the special appointment mandated by both "the public interest" and "potential and actual conflicts of interest" of current Department and FBI officials. *Id.* at 1. The letter at no time explicitly names or otherwise identifies the purportedly conflicted Department or FBI official(s), but alleges that there is evidence of "bias, trending toward animus," of the inappropriate use of "political opposition research" in court filings, and of questionable use of the Foreign Intelligence Surveillance Act (FISA) warrant process. *Id.* at 1. The March Letter concludes that a special counsel must be appointed to review:

> [D]ecisions made and not made by the Department of Justice and the FBI in 2016 and 2017, including but not limited to evidence of bias by any employee or agent of the DOJ, FBI, or other agencies involved in the investigation; the decisions to charge or not charge and whether those decisions were made consistent with the applicable facts, the applicable law, and traditional investigative and prosecutorial policies and procedures; and whether the FISA process employed in the fall of 2016 was appropriate and devoid of extraneous influence.

---

to undertake a review. The irony is not lost on American Oversight that this apparent misrepresentation is immediately preceded in the Boyd Response by a statement that "the Department's leadership has a duty to carefully evaluate the status of ongoing matters to ensure . . . that the Department's communications with Congress are accurate and complete" Boyd Response at 23. Nevertheless, in light of the Department's sworn declaration that the representation to Congress that multiple senior prosecutors had been assigned was false, Brinkmann Decl. ¶ 14, American Oversight is no longer litigating the adequacy of the search for records to reconcile the obvious discrepancy.

*Id.* at 2.

On March 15, 2018, Chairman Chuck Grassley and three other members of the U.S. Senate Committee on the Judiciary wrote a letter to Attorney General Sessions and Deputy Attorney General Rosenstein also requesting the appointment of a second special counsel to investigate the application and renewals of a FISA warrant against former Trump Campaign advisor Carter Page. Cafasso Decl. Ex. 4 ("Senate Letter"). The senators went on to state that they "believe that the appointment should specifically cite, rely on, and follow the Department's regulations governing such an appointment" so as to "ensure that the appointment of a special counsel rests on a clear, well-defined predicate and scope, and to give the American people the fullest possible confidence in his or her independence and authority." *Id.* at 2.

On March 29, 2018, Attorney General Sessions responded to all three Chairmen's call for "the appointment of a Special Counsel to review certain prosecutorial and investigative determinations made by the Department of Justice in 2016 and 2017." *See* Letter from Jeff Sessions, Attorney General, U.S. Dep't of Justice, to Chuck Grassley, Chairman, U.S. Senate, Comm. on the Judiciary, Bob Goodlatte, Chairman, U.S. House of Representatives, Comm. on the Judiciary & Trey Gowdy, Chairman, U.S. House of Representatives, Comm. on Oversight & Government Reform (Mar. 29, 2018) (found in Brinkmann Decl. Ex. A at 25–28) ("Sessions Response"). In that letter, Attorney General Sessions restated the central (and apparently facially inaccurate) proposition in the Boyd Response—that he "already [has] directed senior federal prosecutors to evaluate certain issues previously raised by the Committee." *Id.* at 27. He then added that he asked U.S. Attorney John W. Huber "to lead this effort." *Id.* Attorney General Sessions further stated that Mr. Huber is working in cooperation with the Inspector General and that the "additional matters raised in your [March Letter] fall within the scope of his existing

mandate." *Id.* at 28. The Attorney General then concluded the letter by saying he was "making your letters on this and related issues available to the Department's leadership, Inspector General Horowitz, and Mr. Huber for such action as is appropriate." *Id.*

*The Department's Past Practices Regarding the Appointment of Special Prosecutors*

Mr. Huber is not the first U.S. Attorney appointed as a "special prosecutor" to investigate matters outside of his immediate mandate.[2] When such appointments have been made in the past, the Department has provided clear guidance on the scope of their investigations—with directives often memorialized in writing or with public statements.

In 2003, in his role as Acting Attorney General, James Comey assigned the U.S. Attorney for the Northern District of Illinois, Patrick Fitzgerald, to look into whether the Bush White House deliberately leaked the identity of a CIA employee. *See* Cafasso Decl. Ex. 5. In doing so, Acting Attorney General Comey wrote Mr. Fitzgerald a series of letters specifically stating the matter he was to investigate and the authority delegated to him and under which he was to pursue the investigation—specifically that the investigation was of "the alleged unauthorized disclosure

---

[2] A "special prosecutor" is distinct from the "special counsel" for which the chairmen were calling. The Department promulgated the current iteration of the special-counsel regulations in 1999. A.G. Order No. 2232-99, 64 Fed. Reg. 37,038–44 (July 9, 1999) (to be codified at 28 C.F.R. pts. 0 & 600). In doing so the Department determined that the appointment of a special counsel is to be reserved for those matters where "the Attorney General concludes that extraordinary circumstances exist such that the public interest would be served by removing a large degree of responsibility for a matter from the Department of Justice." *Id.* at 37,038. The extraordinary nature of the appointment is reflected in the fact that the regulations have only been invoked twice in their twenty-year history. *See* Sessions Response at 27. But, as Attorney General Sessions noted in his response to the three congressional chairmen, "in high-profile circumstances involving other politically sensitive matters, it has been more common to make special arrangements within the Department to ensure that actual or apparent conflicts can be avoided, while experienced and accountable prosecutors conduct an efficient and appropriate investigation that comports with the interests of justice and with the public interest." *Id.* In appointing special prosecutors in these "high-profile circumstances," Attorneys General have relied on some of the same statutory provisions that provide the basis for the special-counsel regulations. *See* 28 U.S.C. §§ 510, 515; *see also* Cafasso Decl. ¶ 6; Cafasso Decl. Ex. 5.

of a CIA employee's identity." Cafasso Decl. ¶ 6; Cafasso Decl. Ex. 5. Mr. Fitzgerald's appointment and the nature of his investigation were publicly reported at the time. Cafasso Decl. Ex. 6.

In 2008, after a report by the Department's Office of the Inspector General and the Office of Professional Responsibility found that inappropriate political pressure led to the mass firing of U.S. Attorneys, Attorney General Michael Mukasey appointed the Acting U.S. Attorney for the District of Connecticut, Nora Dannehy, to investigate the matter further to determine whether criminal charges should be brought. *See* Cafasso Decl. Ex. 7. Specifically, Attorney General Mukasey provided clear direction to Ms. Dannehy to pick up where the 392-page report left off—"to assess the facts uncovered, to conduct further investigation as needed, and ultimately to determine whether any prosecutable offense was committed with regard to the removal of a U.S. Attorney or the testimony of any witness related to the U.S. Attorney removals"—as memorialized in a publicly released statement. *See id.* Ms. Dannehy's appointment and the nature of her investigation were publicly reported at the time. *See* Cafasso Decl. Ex. 8.

Also in 2008, Attorney General Mukasey tasked the then-Deputy U.S. Attorney for the District of Connecticut, John Durham, to investigate the destruction of interrogation videotapes by the CIA. *See* Cafasso Decl. Exs. 9 & 10. In 2009, Attorney General Eric Holder expanded Mr. Durham's mandate to include "a preliminary review into whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations," *see* Cafasso Decl. Ex. 11—again memorialized in publicly released statements, *see* Cafasso Decl. Ex. 12.

In 2010, Mr. Fitzgerald, still serving as U.S. Attorney for the Northern District of Illinois, was tasked by written appointment with supervising an investigation into "whether criminal charges are appropriate in connection with any matter arising out of the Department of Defense

seizures of certain photographs from Guantanamo Bay detainees." *See* Cafasso Decl. Ex. 13.

Over the course of the investigation, Mr. Fitzgerald received at least two more letters

supplementing and amending the scope of his investigation and clarifying the authority under

which he did so. *See* Cafasso Decl. Exs. 14 & 15.

*American Oversight's FOIA Requests and the Instant Litigation*

Shortly after the Boyd Response was sent to Congress, Plaintiff American Oversight

submitted four FOIA requests to Defendant on November 22, 2017, seeking records that would

inform the public as to the nature and scope of the new investigation that the agency was

undertaking. *See* Brinkmann Decl. Ex. B. One of those requests sought from the Office of the

Attorney General, the Office of the Deputy Attorney General, and the Office of Legislative

Affairs:

> Records sufficient to identify all of the "senior federal prosecutors"
> who have been "directed" "to evaluate certain issues raised in
> [Congressman Robert Goodlatte's] letters," as indicated in the
> Department of Justice's November 13, 2017 response signed by
> Assistant Attorney General Stephen Boyd, attached for your
> convenience.

*See id.* at 74–81 ("Prosecutors FOIA"). Another request sought from the Office of the Attorney

General and the Office of the Deputy Attorney General:

> All guidance or directives provided to the "senior federal
> prosecutors" who have been "directed" "to evaluate certain issues
> raised in [Congressman Robert Goodlatte's] letters," as indicated in
> the Department of Justice's November 13, 2017 response signed by
> Assistant Attorney General Stephen Boyd, attached for your
> convenience, regarding their performance of that task.

*See id.* at 66–73 ("Guidance FOIA").

On February 12, 2018, after the Department failed to make a timely determination as

required by law, American Oversight initiated the instant litigation to require the Department to

promptly make reasonable efforts to search for records responsive to the four FOIA requests and to promptly produce all non-exempt, responsive records. *See* Compl., ECF No. 1. The Department filed its Answer on March 22, 2018. *See* Answer, ECF No. 7. On July 16, 2018, the Department issued its final determination for both the Prosecutors FOIA and the Guidance FOIA. *See* Brinkmann Decl. Ex. D. The Department produced the Sessions Response to satisfy the Prosecutors FOIA and stated that, with respect to the Guidance FOIA, aside from the Boyd Response, "no additional records responsive to [American Oversight's] request were identified." *Id.* at 89.

During the course of this litigation, the parties narrowed their dispute to the adequacy of the agency's searches for records responsive to the Prosecutors FOIA and the Guidance FOIA. Brinkmann Decl. ¶ 8. On November 16, 2018, the Department moved for summary judgment. *See* Def.'s Mot. for Summ. J., ECF No. 16. In light of the Department's sworn declaration that the representation to Congress that the Attorney General had directed "senior federal prosecutors" (plural) to undertake a review of the matters raised in the July and November Letters was inaccurate, *see* Brinkmann Decl.¶ 14, American Oversight discretionarily withdraws its challenge to the adequacy of the search for records responsive to the Prosecutors FOIA. American Oversight, however, continues to oppose the Department's motion and cross-moves for summary judgment with respect to the adequacy of the search for records responsive to the Guidance FOIA.

## ARGUMENT

The Department asks American Oversight and the Court to believe that *no records* were created in the course of tasking a U.S. Attorney to investigate some indefinite subset of no fewer than fifteen itemized questions—all of which were outside of his statutorily defined jurisdiction

as the federal prosecutor for Utah—posed by the chairmen of three committees of the United States Congress that required the Attorney General himself to respond in writing. Not only is this inconsistent with the previous manner by which the Department assigned special prosecutors but there are also positive indications that responsive records were omitted. The Department has failed to conduct an adequate search, and summary judgment in favor of American Oversight is appropriate.

## I.      Legal Standards

Summary judgment is appropriate when the record as a whole demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment on the adequacy of an agency's search may only be granted if the agency demonstrates "beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation marks omitted). "[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of the Army* ("*Oglesby I*"), 920 F.2d 57, 68 (D.C. Cir. 1990). An agency "cannot limit its search to only one or more places if there are additional sources that are likely to turn up the information requested." *Valencia-Lucena*, 180 F.3d at 326 (internal quotation marks omitted). If a review of the agency's affidavit "raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials,' summary judgment [in favor of the agency] is inappropriate." *Id.* (quoting *Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824, 837 (D.C. Cir. 1979)) (citing *Oglesby v. U.S. Dep't of the Army* ("*Oglesby II*"), 79 F.3d 1172,

1185 (D.C. Cir. 1996)); *Krikorian v. U.S. Dep't of State*, 984 F.2d 461, 468 (D.C. Cir. 1993);

*Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 369–70 (D.C. Cir. 1980)).

## II.    The Department Did Not Adequately Describe or Support Its Search.

To begin with, the Department of Justice has failed to provide the Court or the parties with declarations providing a sufficiently detailed account of its search to permit evaluation of the adequacy of the search. Rather, the limited information provided regarding the search raise additional questions necessary to evaluate the conduct of the search. Even before reaching the question of whether the search actually conducted was adequate, these deficiencies prevent American Oversight and the Court from meaningfully evaluating the adequacy of the Department's search.

With respect to the search of the Office of the Attorney General, for instance, Defendant's declaration provides a conclusory description of events that simply raises additional questions. When did Attorney General Sessions task Mr. Huber with his new assignment? How many "meetings and discussions" were there "among a small group of Department officials"? What was the scope of the "discussions with Mr. Huber himself" to ensure that he considered all means of conveyance of guidance and directives? *See* Brinkmann Decl. ¶ 15.

Moreover, given the Department's primary reliance on assertions by a specific official within the Office of the Attorney General, *see id.* ¶¶ 14-16, it would be appropriate for that official—the then-Chief of Staff to the Attorney General—to submit a declaration supporting the adequacy of the Department's search. Indeed, this is exactly what other agencies have done in instances where the search for records relies on the representations of high-ranking officials like an agency head's Chief of Staff. *See*, *e.g.*, Decl. of Ryan Jackson, C*tr. for Biological Diversity Inc. v. U.S. Envtl. Prot. Agency*, No. 17-cv-816 (D.D.C. Apr. 11, 2018) ECF No. 22-5 (submitted

by Chief of Staff to EPA Administrator regarding search and production of records requested under FOIA). And yet in this case, the Department's declaration does not even indicate whether the officials with whom the declarant conferred reviewed the document for accuracy.

Similarly, the vagueness of the declaration's description of the "search" of the Office of the Deputy Attorney General raises more questions regarding the adequacy of the search than it answers. Ms. Brinkmann declares that she

> took the additional step of conferring with the Office of the Deputy Attorney General . . . regarding the information provided to me by [the Office of the Attorney General]. As a result of this discussion, I concluded that the [Office of the Attorney General] information regarding the lack of written guidance or directives to Mr. Huber was adequate and that further searches would be unlikely to identify records relevant to Plaintiff's request.

Brinkmann Decl. ¶ 15. This description fails to resolve basic questions about the search, such as with whom in the Office of the Deputy Attorney General she conferred, when the conferral occurred, and what the person (or those persons) said in response to lead her to such a conclusion.

The declaration also fails to address important facts about the purported search. For instance, in asserting that the specific parameters of a high-profile investigation into the president's political opponents and the Department itself were relayed only orally to Mr. Huber, *see* Brinkmann Decl. ¶ 15, the declaration does not state that OIP clarified obvious questions about potential records raised by that claim, such as whether there were notes or talking points prepared for the alleged "meetings and discussions" that contained written guidance about the investigations, or the factual basis for the then-Chief of Staff to the Attorney General's knowledge about what records other participants in the meeting had used, including responsive notes or talking points. Nor does the declaration make clear that OIP clarified the inconsistency

between the claim that there were no written materials exchanged with Mr. Huber addressing the scope of his investigation, and thus that "further searches would be unlikely to identify records relevant to Plaintiff's request," *see* Brinkmann Decl. ¶ 15, with the fact that the Department told Congress that the Attorney General had made the chairmen's letters "available to . . . Mr. Huber," Sessions Response at 28. These material lacuna reflect the insufficiency of the search. At a minimum, the deficient description of the search purportedly conducted precludes summary judgment in favor of the Defendant.

## III.  The Department Failed to Conduct an Adequate Search for Records.

Based on the information that is available in the Department's search declaration, unless the agency has too narrowly interpreted the request, it is simply not credible that there are no responsive records to the Guidance FOIA given the nature of Mr. Huber's supposed assignment as well as the Department's documented prior practice in delegating responsibility to undertake an investigation to a special prosecutor that would otherwise fall outside their ordinary mandate.

### A.  It Is Not Credible that U.S. Attorney Huber Would Be Directed to Undertake a Complex Investigation of the High-Profile and Sensitive Matters Raised in the July and September Letters Without Any Written Guidance Regarding the Scope of His Review.

The agency bears the burden of showing that it conducted a good-faith search reasonably calculated to identify the requested records. To establish that it has conducted an adequate search, an agency must do more than "generally assert[] adherence to the reasonableness standard." *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1122 (D.C. Cir. 2007). Given both the nature of the sensitive, complex, and high-profile matters Mr. Huber has reportedly been assigned to review and the Department's well-established practice of memorializing the appointment of special prosecutors through written directives and public statements, the

Department's assertion that its search was adequate—despite uncovering no written guidance—does not hold water.

The duties of a U.S. Attorney are statutorily defined. "Within his district," a U.S. Attorney is to prosecute criminal offenses; prosecute and defend civil actions for the government; appear in behalf of defendants in customs actions; prosecute tax violations; and "make such reports as the Attorney General may direct." 28 U.S.C. § 547. Thus a U.S. Attorney's criminal responsibilities are generally to investigate and prosecute crimes occurring in his district. However, the law also provides that the Attorney General may delegate, "as he considers appropriate," any of his duties or functions to another officer, employee, or agency of the Department. 28 U.S.C. § 510. In the course of such delegation, "when *specifically directed* by the Attorney General," a special prosecutor may "conduct any kind of legal proceeding . . . which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought." 28 U.S.C. § 515(a) (emphasis added).

Consequently, as U.S. Attorney for the District of Utah, it is unlikely that Mr. Huber would have statutory authority to undertake a review of any of the matters raised in the July and September Letters unless he had been "specifically directed" by the Attorney General to do so. In this context, particularly given the high-profile, complex, and sensitive nature of the matters he has purportedly been directed to investigate, it is simply not credible that he has received no written guidance, formal or informal, to identify or clarify the scope of the investigation the Attorney General has assigned to him.

The letters sent by Congress raised numerous complex, overlapping, and sensitive matters that the authors believed merit serious and thorough investigation by the Department.

The July Letter broadly articulates fourteen separate lines of inquiry—including items of such specificity as "2) The shadow cast over our system of justice concerning Secretary Clinton and her involvement in mishandling classified information." July Letter at 15–16. The September Letter introduces new concerns regarding Director Comey, specifically "that Director Comey and other senior Justice Department and government officials may have pre-judged the 'matter' before all the facts were known, thereby ensuring former Secretary Clinton would not be charged for her criminal activity." September Letter at 21.

The Boyd Response replies to both the July and September Letters by summarizing the fifteen separate items they raise as: "the sale of Uranium One, alleged unlawful dealings related to the Clinton Foundation and other matters." Boyd Response at 23. In responding to the Chairman's request for the appointment of a second special counsel, the Boyd Response states, "the Attorney General has directed senior federal prosecutors to evaluate certain issues raised in your letters." *Id.* The Boyd Response does not identify the "certain issues" that the Attorney General directed be investigated. *See id.* at 23–24.[3]

In March 2018, new concerns arose bringing Chairman Trey Gowdy of the House Oversight and Government Reform Committee to join Chariman Goodlatte in a call for a special counsel. The March Letter lacks the precision of the airing of grievances found in the July and

---

[3] Although the "certain issues" are omitted, American Oversight notes that there are three questions from the July Letter that touch on "the sale of Uranium One" and "alleged unlawful dealings related to the Clinton Foundation. July Letter at 16. ("6) WikiLeaks disclosures concerning *the Clinton Foundation* and its potentially unlawful international dealings; 7) Connections between the Clinton campaign, or *the Clinton Foundation*, and foreign entities, including those from Russia and Ukraine; 8) Mr. Comey's knowledge of the purchase of *Uranium One* by the company Rosatom, whether the approval of the sale was connected to any donations made to *the Clinton Foundation*, and what role Secretary Clinton played in the approval of that sale that had national security ramifications") (emphasis added). None of these three questions touch on the topic of the FISA warrant process.

September Letters but does suggest that the Department and the FBI inappropriately used political opposition research and the FISA warrant process in the course of its decisionmaking in 2016 and 2017. *See* March Letter. The Sessions Response assures the chairmen that "[t]he additional matters raised in your March 6, 2018, letter fall within the scope of [Mr. Huber's] existing mandate," and that the Attorney General made their "letters on this and related issues available to . . . Mr. Huber for such action as is appropriate." Sessions Response at 28.

Despite indicating to Congress that Mr. Huber's review had a broad and extant mandate—clear enough to say with certainty that U.S. Attorney Huber would already know the new concerns raised in the March Letter fell within his assignment—the Department's search results in response to the Guidance FOIA claim that Mr. Huber has received no written directives or guidance of any kind regarding the scope of this momentous undertaking that the Attorney General has assigned to him. But the notion that the Department of Justice would assign a special prosecutor to undertake an investigation of such self-evidently significant and high-profile matters without the authority or clarity provided by a written mandate defies belief. It likewise defies common sense that any serious prosecutor would agree to undertake a matter outside his ordinary remit and of such clear significance without the sort of clear lines of authority and clear definition of the scope of his mandate that can only be provided in writing. This explains why, as described more fully *infra* Part III.B, the Department's past practice has consistently been to provide a clear statement regarding the scope of the investigation assigned to a special prosecutor in high-profile matters.

The need here for the level of authority and clarity that can only be conferred in writing is all the stronger in that the matters identified in the July and September Letters overlap with allegations that the Department has already referred to its Office of Inspector General. In

February 2018, Attorney General Sessions stated that he had referred questions regarding the FBI's handling of FISA warrant applications to the Department's Inspector General—a referral contemporaneously acknowledged by the internal watchdog. *See* Cafasso Decl. Ex. 16. Given the complications introduced by potentially overlapping investigations, a clearly defined delegation of authority is all the more important to deconflict Mr. Huber's and the Inspector General's respective investigative efforts. To be sure, the Sessions Response does state that "Mr. Huber is conducting his work . . . in cooperation with the Inspector General." Sessions Response at 28. But surely it cannot be that the scope of work of the two Department attorneys is so co-extensive that they are identical, not when the Department in two separate letters to congressional committee chairmen—with one signed by the Attorney General himself—suggested that a special prosecutor had been appointed to investigate matters into which Congress was calling for a special prosecutor.

The nature of the matters purportedly assigned to Mr. Huber further underscore the incredible nature of the suggestion that Mr. Huber was assigned to undertake a matter of this magnitude based on "meetings and discussions." *See* Brinkmann Decl. ¶ 15. If Mr. Huber's investigation were to bear fruit and result in a prosecution, it would be a matter of monumental significance to our nation. President Trump's Department of Justice would literally be using the powers of law enforcement to prosecute the president's former political opponent and others he claims were unlawfully conspiring against his election from within the Department, including the FBI, following a line of inquiry laid out in the president's tweets. If the Department of Justice is truly launching an investigation of such matters, surely it would take care to dot every "i" and cross every "t" to mitigate the inference that the Department was being used as a tool to pursue the president's partisan interests. The notion that the Department would embark on such a

momentous endeavor without the clarity or clear authority provided by written guidance beggars belief. The significant reliance of the Department's purported search on the indirect assertions of one self-interested participant in these efforts in concluding that no responsive records exist indicates that the search was neither credible nor adequate.

> **B.** **The Department's Claimed Lack of Records Is Not Credible in Light of Its Documented Prior Practice in Appointing a Special Prosecutor.**

These concerns explain precisely why the Department has a consistent practice, when directing a special prosecutor to undertake a high-profile and potentially controversial investigation outside the prosecutor's ordinary remit, of making the appointment with a written assignment of clearly defined duties and/or a public announcement of the appointment together with a clearly defined and discrete investigative mandate. Thus, prior to Mr. Huber's assignment, when directing Department attorneys to undertake special matters outside their remit, even matters of lower profile and less politically sensitive than the matters raised by the July and September Letters, the appointment of those Department attorneys as special prosecutors has involved a combination of such written assignment and/or public announcement.

Thus, when U.S. Attorney Patrick Fitzgerald was assigned to look into whether any executive branch officials deliberately leaked the identity of a CIA employee, he received a series of letters specifically describing the scope of his mandate and stating in detail the particular matter or matters he was directed to investigate. Cafasso Decl. Ex. 5. When Acting U.S. Attorney Nora Dannehy was tasked with investigating the mass firing of U.S. Attorneys, her appointment was publicly announced by the Attorney General and her express mandate was to pick up where a more than 350-page Department report left off, conduct a criminal investigation, and evaluate whether any criminal charges were appropriate. Cafasso Decl. Ex. 7. When Deputy U.S. Attorney John Durham was tasked with investigating the destruction of

videotapes by the CIA, the scope of his mandate was specifically tied to an investigation recommendation from the Department's National Security Division, and both the recommendation and his appointment were publicly reported. Cafasso Decl. Exs. 9 & 10. When Mr. Durham's mandate was expanded twenty months later, it was again specifically detailed and publicly reported. Cafasso Decl. Exs. 11 & 12. And when Mr. Fitzgerald was tapped again to serve as a special prosecutor—this time to investigate "any matter arising out of the Department of Defense seizures of certain photographs from Guantanamo Bay detainees"—he was again tasked with such authority and clear designation of his mandate by way of multiple letters expressly delineating the scope of his new assignment. Cafasso Decl. Exs. 13, 14, & 15.

In light of this pattern of Department practice, it would be anomalous indeed if the Attorney General here specifically directed Mr. Huber to undertake an investigation into serious allegations of misconduct against the president's political opponents and even against the Department itself, including the FBI, with no more record of the delegation than a phone call. Ninety-two years ago the Supreme Court declared that the government is entitled to a "presumption of regularity" in the performance of the official acts of public officers. *United States v. Chem. Found. Inc.*, 272 U.S. 1, 14 (1926). If the law requires the Attorney General to delegate his work through specific direction, as 28 U.S.C. § 515 does, and if the delegation of authority to special prosecutors has consistently been provided via written direction since at least the expiration of the independent counsel statute, the presumption of regularity holds that there should be a written record of Attorney General Sessions's delegation to Mr. Huber. That no record was so discovered is a positive indication of overlooked material, *Founding Church of Scientology*, 610 F.2d at 837, and supports American Oversight's position that the Department's search was inadequate.

## C. The Department Is Construing the Request Too Narrowly.

The Department's inquiry to identify records responsive to the Guidance FOIA was also not reasonably calculated to locate all potentially responsive records. Plaintiff's request encompasses "[a]ll guidance or directives provided to [Mr. Huber in connection with the direction to evaluate certain issues raised in the July and September Letters] regarding [his] performance of that task," whether formal or informal. *See* Brinkmann Decl. Ex. B at 66–73. A wide range of potential records would be responsive to this request, including, to be sure, formal orders or letters directing a review, but also including more informal records of guidance or direction regarding the performance of Mr. Huber's assigned task, such as emails to Mr. Huber or his team informally addressing or clarifying the scope of his assigned duties; talking points or notes for meetings, discussions, or teleconferences with Mr. Huber discussing the fact or scope of his assignment; or notes taken by Mr. Huber during such a meeting, discussion, or teleconference reflecting his understanding of the task he has been directed to undertake. Indeed, even a communication providing the July and September Letters themselves to Mr. Huber, and any accompanying commentary, would be responsive to Plaintiff's request, insofar as those letters formed the basis for identifying the "certain issues" the Attorney General directed Mr. Huber to investigate. Even taking the Department at its word, *dubitante*, that there was only an oral communication when the Attorney General formally assigned Mr. Huber to undertake this momentous assignment, the Department failed to search for other informal guidance or direction that would be responsive to Plaintiff's request.

Rather, the limited nature of the Department's "search" was not reasonably calculated to find all such records.[4] Reliant as the inquiry was on the recollection of individuals, there is no reason to think it would locate the sorts of informal guidance or direction to Mr. Huber regarding the performance of his investigation called for by the request. Even if it could possibly be reasonable to expect the Attorney General's chief of staff to recall if an Attorney General Order was issued regarding Mr. Huber's assignment, there is no way he could reasonably be expected to know if any of the at least five officials involved in the meeting, discussion, or teleconference with Mr. Huber, *see* Brinkmann Decl. ¶ 15, as well as other Department officials involved in the assignment, exchanged any emails with Mr. Huber or his senior staff that contained responsive guidance, direction, or clarification regarding his assigned task. The fact that the July and September Letters themselves were almost surely conveyed to Mr. Huber, but the "search" failed to identify that record, underscores the inadequacy of the purported search. The Sessions Response itself makes clear that such records exist; Attorney General Sessions closes his letter by stating: "I am making your letters on this and related issues available to . . . Mr. Huber for such action as is appropriate." Sessions Response at 28. Of course, any communication from Department leadership making these letters available to Mr. Huber and directing him to take such action as is appropriate would be responsive to Plaintiff's request. Such a positive indication of overlooked records supports the conclusion that the Department's search was inadequate. *See Valencia-Lucena*, 180 F.3d at 326 (citations omitted).

---

[4] As discussed above, American Oversight is limited in its ability to know the bounds of the Department's search. Reminiscent of the children's game of "Telephone," Ms. Brinkmann spoke with someone who spoke to the then-Chief of Staff to the Attorney General and Mr. Huber. What question or series of questions that someone asked the then-Chief of Staff to the Attorney General and Mr. Huber, any attempts, if any, that someone took to refresh the recollections of the then-Chief of Staff to the Attorney General and Mr. Huber, or how these inquiries were made are unknown. *See* discussion *supra* Section II.

Even if Mr. Huber was not given any written directives or guidance of any kind, an adequate search would still require that the Department search for and produce any responsive records from the Office of the Attorney General and the Office of the Deputy Attorney General reflecting the talking points, notes, and other records relied on by meeting attendees during the "meetings and discussions" wherein Attorney General Sessions tasked Mr. Huber with investigating "certain issues" of significant importance to three congressional chairmen. If the Attorney General of the United States can represent to Congress that he has made information "available to" his subordinates, American Oversight has every confidence that the Department can make records substantiating that statement available to the American public.

**D.     The Additional Search Sought by Plaintiff Would Not Be Burdensome.**

Finally, it would not be difficult for the Department to complete an adequate search that would be reasonably calculated to identify all guidance or direction provided to Mr. Huber, formal or informal. For instance, a search of Mr. Huber's email account, as well as the account of his senior staff assigned to the Attorney General's review, if any, for communications with a small handful of people in the Department's leadership offices should be sufficient to identify responsive emails. Alternatively, the email accounts of a small number of officials in the leadership offices could be searched for communications with Mr. Huber. Such a search would not be onerous. As a result of the many limitations on such a search—to one or two custodians, for correspondence with a small number of officials, in a limited time frame, on limited subject matters—it is highly likely that it would yield only a limited number of potentially responsive communications to be processed. Likewise, a handful of people could be asked for notes or talking points from the "meetings and discussions among a small group of Department officials" where the direction or guidance was purportedly conveyed, *see* Brinkmann Decl. ¶ 15, given the

small number of attendants identified,. These limited efforts could provide Plaintiff and the American people with clarity regarding the nature of the controversial investigation that the Attorney General has directed Mr. Huber to undertake into the president's political opponents and into allegations of misconduct by the Department and the FBI.

## **CONCLUSION**

For the foregoing reasons, Plaintiff American Oversight respectfully requests that this Court deny Defendant's motion for summary judgment, grant American Oversight's cross-motion for summary judgment and require the Department to conduct a new search for records responsive to the Guidance FOIA.


Dated: December 13, 2018                          Respectfully submitted,

                                                  */s/ Cerissa Cafasso*
                                                  Cerissa Cafasso
                                                  D.C. Bar No. 1011003
                                                  Austin R. Evers
                                                  D.C. Bar No. 1006999

                                                  AMERICAN OVERSIGHT
                                                  1030 15th Street NW, B255
                                                  Washington, DC 20005
                                                  (202) 869-5244
                                                  cerissa.cafasso@americanoversight.org
                                                  austin.evers@americanoversight.org

                                                  *Counsel for Plaintiff*